**SIGNED THIS: February 06, 2006**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MICHAEL S. SABOL and | ) | |
| RHONDA K. SABOL, | ) | No. 05-80582 |
| Debtors. | ) | |
| | ) | |
| | ) | |
| CHARLES E. COVEY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 05-8138 |
| | ) | |
| MORTON COMMUNITY BANK, | ) | |
| Defendant. | ) | |

**O P I N I O N**

This adversary proceeding is before the Court, after trial, on the complaint by Charles E. Covey, as Trustee of the Chapter 7 estate ("TRUSTEE"), to determine the validity of a security interest held by Morton Community Bank ("BANK") in several items of sound equipment owned by Michael S. Sabol, one of the Debtors ("DEBTOR"). The matter was taken under advisement by the Court and the parties have submitted briefs.

The main issue is whether the Composite Document Rule can rescue the BANK from the absence of a security agreement.

The following facts are not in dispute. On May 25, 2002, the DEBTOR, doing business in the recording industry as Sound Farm Productions, completed an application for a Small Business Administration (SBA) guaranteed loan to expand his business, requesting approval of a loan from the BANK, as Lender, in the principal amount of $58,000. The BANK'S application for the SBA guarantee, comprised of a separate page completed and signed by its loan officers dated June 3, 2002, contains a section entitled "Loan Terms," which includes a subsection for collateral, requesting information as to description, market value and existing liens. Among the assets listed on the application were assets the DEBTOR presently owned and pledged to BankPlus, in addition to two items he intended to acquire using a portion of the proceeds of the loan.

On July 5, 2002, the DEBTOR executed an SBA form promissory note in the principal amount of $58,000 payable to the BANK. In addition to the note, the DEBTOR signed another document, in letter format, which provided:

> In consideration for Morton Community Bank granting a loan to Michael S. Sabol DBA Sound Farm Productions, the undersigned does hereby authorize Morton Community Bank to execute, file and record all financing statements, amendments, termination statements and all other statements authorized by Article 9 of the Illinois Uniform Commercial Code, as to any security interest in the loan or refinancing presently sought by the undersigned, as well as all loans, refinancing or workouts hereafter granted by Morton Community Bank to Michael S. Sabol DBA Sound Farm Productions.

On July 18, 2002, the BANK filed a standard form Uniform Commercial Code (UCC) financing statement, covering inventory, accounts receivable and equipment. The

financing statement was not signed by the DEBTOR.  No separate document entitled "Security Agreement" was signed by the DEBTOR.

Although he initially dealt with loan officer Will Thomas, the DEBTOR testified that when he went to the BANK to sign the loan documents, a different loan officer handled the closing.  He did not recall any discussion about a security agreement or a security interest.  The DEBTOR testified that he signed the documents in order to comply with the BANK'S requirements to obtain the loan.  The proceeds of the loan were used for operating capital and to purchase additional equipment.  The DEBTOR spent less than $20,000 for equipment, which he began to purchase shortly after he received the loan.

The DEBTOR and his wife, Rhonda K. Sabol, filed a joint petition for bankruptcy under Chapter 7 on February 14, 2005.  They listed Morton Community Bank as a secured creditor, holding a security interest in "tools" valued at $12,410, with a total claim of $35,792.91.  The DEBTOR filed an intent to surrender the "tools" to the BANK.  The BANK filed a proof of claim, asserting a secured claim in the amount of $36,967.34.[1]  Contending that the BANK'S purported security interest never attached to the equipment, the TRUSTEE filed a report of possible assets, disclosing that he intended to administer the sound equipment as assets of the bankruptcy estate and brought this adversary complaint to determine the validity of the BANK'S lien.

At the trial, the DEBTOR testified concerning the loan transaction.  The only other witness was Josh Graber, a representative of the BANK.  Although Graber was employed by the BANK at the time the loan was made, he was not involved in the making of the loan

---

[1] The TRUSTEE has objected to the BANK'S claim, and as the BANK notes in its response to that objection, the Court's ruling in this proceeding will be determinative of that issue.

to the DEBTOR. He testified that no security agreement was prepared for the loan in question, although the BANK typically used one for secured loans.

The TRUSTEE contends that the BANK does not have a valid purchase money security interest under Article 9 of the UCC, 810 ILCS 5/9-101 *et seq.*, because there is no separate document captioned "Security Agreement" or any language in any other document explicitly granting a security interest.[2] The BANK, relying on the "Composite Document Rule," contends that the loan application, the promissory note, the authorization and the financing statement, taken together, establish an agreement to create a security agreement.

**ANALYSIS**

Generally, state law determines the nature and extent of the property rights in the debtor's assets. *See, e.g., Butner v. U.S.*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Under Illinois law, which governs the issue of whether the parties have entered into a valid security agreement, a nonpossessory security interest does not attach and is not enforceable unless the debtor has authenticated a security agreement that contains a description of the collateral, value has been given, and the debtor has rights in the collateral.[3] 810 ILCS 5/9-203(b)(3)(A). A "security agreement" is defined as "an agreement

---

[2] The TRUSTEE'S suggestion that the revised version of Article 9 should apply here drew no opposition from the BANK. This Court agrees. Although the former Article 9 was in effect at the time the BANK allegedly created its security interest, the financing statement and the bankruptcy petition were filed after revised Article 9 took effect. The majority of courts have held that the revised version should apply under those circumstances. *In re Wiersma*, 283 B.R. 294 (Bankr.D.Idaho 2002); *In re Grabowski*, 277 B.R. 388 (Bankr.S.D.Ill. 2002)(relying on 810 ILCS 5/9-702 (2001), noting that the statute provides that revised Article 9 "applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before [the statute's] effective date[.]").

[3] The revisions to the UCC that became effective in Illinois on July 1, 2001, changed the § 9-203 requirement from a "signed" security agreement to one that the debtor has "authenticated." This Court is of the view that the change was intended to fast-forward the law into the computer age where electronic signatures or authentication are rapidly becoming the norm. As such, the change is immaterial to the issues resolved in this Opinion.

4

that creates or provides for a security interest." 810 ILCS 5/9-102(73). A "security interest" is an interest in personal property or fixtures which secures payment or performance of an obligation. 810 ILCS 5/1-201(37). The requirement of a written security agreement is said to serve two purposes: the first being evidentiary in that it eliminates disputes as to what items are secured and the second in the nature of a statute of frauds, by precluding the enforcement of claims based only on an oral representation. *In re Outboard Marine Corp.*, 300 B.R. 308 (Bankr.N.D.Ill. 2003); *In re Owensboro Canning Co., Inc.*, 82 B.R. 450 (W.D.Ky. 1988); *In re Data Entry Service Corp.*, 81 B.R. 467 (Bankr.N.D.Ill. 1988). No particular words of grant or "magic words" are required to be included in a security agreement to create a security interest. *In re Krause,* 114 B.R. 582, 593 (Bankr.N.D.Ind. 1988). Notwithstanding the lenity of the Composite Document Rule, there must be some language reflecting the debtor's intent to grant a security interest. *In re NTA, LLC*, 380 F.3d 523 (1st Cir. 2004); *In re Zurliene*, 97 B.R. 460 (Bankr.S.D.Ill. 1989). Accordingly, a financing statement which does not contain any grant language by the debtor creating a security interest in the described collateral, but merely identifies the collateral, cannot substitute for a security agreement. *In re Westpfahl*, 171 B.R. 330 (Bankr.C.D.Ill. 1994); *Zurliene, supra.*

    Notwithstanding the statutory requirement of a signed or authenticated security agreement that describes the collateral, some courts have adopted a liberal view of what suffices to meet that requirement. Under the "Composite Document Rule," two or more documents in combination may qualify as a security agreement. *In re Numeric Corp.,* 485 F.2d 1328, 1331 (1st Cir. 1973) (separate formal document entitled "security agreement" is

5

not always necessary to satisfy the signed writing requirement of § 9-203). Whether and to what extent the Composite Document Rule applies is a question of state law. *Matter of Bollinger Corp.,* 614 F.2d 924 (3rd Cir. 1980) (Pennsylvania law). The Seventh Circuit Court of Appeals has affirmed a district court's holding that all of the documents constituting a transaction may be considered when analyzing whether an assignment, absolute on its face, was, in fact, intended as a security agreement. *Wambach v. Randall,* 484 F.2d 572 (7th Cir. 1973).

Illinois law governs this dispute. The Illinois Supreme Court has not addressed whether the Composite Document Rule may be used to satisfy the security agreement requirement of UCC § 9-203(b)(3)(A). The only Illinois Appellate Court decision addressing the Rule is *Sears, Roebuck & Co. v. Conry,* 321 Ill.App.3d 997, 748 N.E.2d 1248 (Ill.App. 3 Dist. 2001), a case in which a Sears credit card purchase was at issue. After having earlier opened the account by signing a credit card application that contained a security agreement, the customer made credit card purchases and signed sales tickets describing the merchandise and containing language granting Sears a purchase money security interest in the purchased goods.[4] The form of security agreement was periodically updated by Sears by sending the cardholder the new form with no signature required. On the issue of whether Sears proved that it retained a purchase money security interest in the goods listed on the sales receipts, the court held as follows:

> In the instant case, the defendants signed Sears credit card sales receipts incorporating a security agreement by reference and granting Sears

---

[4] Immediately above the customer's signature on the sales receipts was printed: "Purchased under my Sears account and security agreement, incorporated by reference. I grant Sears a security interest in this merchandise until paid, unless prohibited by law." 321 Ill.App.3d at 999.

6

a security interest in the items purchased. By analogy with the cases cited above, the signed Sears credit card receipts satisfied the Illinois statutory requirement of a signed security agreement.

Since the sales receipts, by themselves, satisfied the requirements of § 9-203 of a signed writing describing the collateral and granting a security interest therein, *Conry* is not a true composite document case and, in this Court's view, has no application to the issue at bar. It thus appears that no Illinois court has approved or disapproved of the use of the Composite Document Rule.

The pre-UCC era of chattel mortgages, and the technical and sometimes complex requirements associated therewith, fostered common law exceptions in the name of equity and pragmatism.[5] Beginning in 1962, however, the UCC ushered in a new, simplified regime for documenting and perfecting secured transactions. Because the UCC reduces to an absolute minimum the formal requirements for the creation of a security interest, the need for those equitable exceptions no longer exists. In the interests of certainty and maintaining some identifiable standard, it is important to enforce the minimal formal requirements set forth in Article 9 of the UCC. *See, In re Kevin W. Emerick Farms, Inc.,* 201 B.R. 790 (Bankr.C.D.Ill. 1996). Thus, an argument can be made that strict rather than liberal interpretation of the UCC documentation requirements is more consistent with the overall purpose of the UCC to create certainty and reliability in commercial transactions. Other

---

[5]Code comment 5 to § 9-203 provides:

The theory of equitable mortgage, insofar as it has operated to allow creditors to enforce informal security agreements against debtors, may well have developed as a necessary escape from the elaborate requirements of execution, acknowledgment and the like which the nineteenth century chattel mortgage acts vainly relied on as a deterrent to fraud. Since this Article reduces formal requisites to a minimum, the doctrine is no longer necessary or useful. More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing.

courts have applied the Composite Document Rule narrowly.  *See, In re NTA, LLC, supra; In re Zurliene, supra; In re Westphal, supra; In re Dean & Jean Fashions, Inc.*, 329 F.Supp. 663 (W.D.Okla. 1971).

The BANK relies upon the DEBTOR'S testimony that he understood that by signing the loan documents that he was granting the BANK a security interest in the equipment that he was going to purchase, as reflected in his treatment of the BANK as a secured creditor in his bankruptcy schedules. The BANK also relies on the itemization of collateral on the loan application, the provision in the note regarding the BANK'S rights in "collateral" and its rights upon default, the debtor's authorization and the description of the collateral in the financing statement.  The BANK'S reliance on the listing of collateral under the description of loan terms on its application for the SBA guarantee reveals nothing about the DEBTOR'S intent to grant a security interest.  The application consists of two separate portions: one completed by the DEBTOR and one completed by the BANK. The listing of the collateral appears on the BANK'S portion of the document.  That page was completed by officers of the BANK and is dated one week after the DEBTOR'S signature on his application for the loan.

The BANK points to the provisions of the note which describe, generically, the BANK'S rights in collateral and upon default.  The note defines "Collateral" as "any property taken as security for payment of this Note."   Upon default, the note authorizes the BANK to "take possession of any Collateral" and to "sell, lease, or otherwise dispose of any Collateral."  The note also provides that the BANK may: "[b]id on or buy the Collateral at its sale;" "preserve or dispose of the Collateral;" "[c]ompromise, release,

renew, extend or substitute any of the Collateral;" and "[t]ake any action necessary to protect the Collateral." The note does not identify the collateral. In fact, the note itself contemplates a separate security agreement. Under the heading of general provisions, the note provides that "Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral."

The DEBTOR'S authorization for the BANK to file a financing statement is equally inefficacious. It authorizes that filing "as to any security interest in the loan . . . presently sought by the [DEBTOR]." *In re Numeric Corp.*, 485 F.2d 1328 (1st Cir. 1973), relied on by the BANK, is distinguishable. In *Numeric*, although the parties had not signed a formal security agreement, the board of directors of the debtor authorized the preparation of a UCC financing statement to cover the creditor's security interest in certain equipment described in a bill of sale.[6] Finding that the directors' resolution established "an agreement in fact" by the parties to create a security interest, the court held that the resolution, taken with the financing statement's itemization of the collateral, constituted a security agreement.

The BANK also relies on its UCC-1 financing statement. The financing statement, as permitted by the Revised UCC, was not signed by the DEBTOR. The financing

---

[6]The resolution in *Numeric* provided:

That the Clerk of the corporation prepare standard form, Uniform Commercial Code financing statements on behalf of the corporation as debtor, to Russell Blank, as the secured party, in such manner and form as to cover Russell Blank's security interest in the property of this corporation as set forth in a Bill of Sale dated March 2, 1962, from said Russell Blank to the corporation, and as hereafter acquired, and as evidence of his security interest in the same.

485 F.2d at 1329.

statement was not filed by the BANK until July 18, 2001, almost two weeks after the loan was closed. No one from the BANK testified that the financing statement was presented to the DEBTOR at the time that he signed the document authorizing its filing. The DEBTOR'S testimony that a security interest was not discussed contradicts any suggestion that the financing statement was presented to the DEBTOR at or prior to the loan closing. This Court will not presume that a financing statement, not shown to be contemporaneous, has any part to play in the Composite Document Rule.

*In re Data Entry Service Corp.*, *supra*, a case involving an SBA loan, relied on by the BANK, is factually distinguishable. In that case, in addition to the note, the debtor signed a Loan Agreement which listed as collateral, first liens on machinery, equipment, furniture and fixtures, inventory, accounts and general intangibles. Directly above the debtor's signature, at the end of the document, the Agreement provided that the debtor agreed to the conditions imposed. In addition, two financing statements describing the collateral were filed with the Secretary of State, each signed by the debtor. The court determined that the Loan Agreement, by itself or in conjunction with the signed financing statements, was sufficient to create a security interest in favor of the SBA.

A similar result was reached in *In re Maddox*, 92 B.R. 707 (Bankr.W.D.Tex. 1988), another SBA-guaranteed loan case. As in *Data Entry*, the debtor had signed a loan agreement which identified collateral under "Terms of the Loan" as a "first lien on all equipment, inventory and accounts receivable." The court's decision in *In re Tracy's Flowers and Gifts, Inc.*, 264 B.R. 1 (Bankr.W.D.Ark. 2001), highlights the weakness of the BANK'S position. Recognizing that a "bare bones" financing statement, standing alone, cannot

double as a "security agreement," the court held that the following additional language included in the creditor's UCC-1, qualified as a security agreement:

> This note is secured by all accounts, inventory and equipment now owned or hereafter acquired by [the debtor] . . . . The loan secured by this lien was made under [a SBA] nationwide program. . . .

264 B.R. at 2.

Whether considered alone or in combination, this Court finds that there is not sufficient evidence of the DEBTOR'S intent to create a security interest in the documents relied on by the BANK. No language conveying a security interest to the BANK is found in any of the documents. There is no evidence that the DEBTOR read or reviewed, much less agreed to, the "loan terms" contained in the BANK'S application to the SBA. The financing statement, containing the only description of collateral, is not signed by the DEBTOR and, in all likelihood, was never seen by him. What is left? Only boilerplate references in the note to the BANK'S rights in "any collateral" and in the authorization to "any security interest."

Had the BANK'S application for SBA guarantee, which listed the collateral, been signed by the DEBTOR, the minimal requirements of § 9-203 may well have been satisfied. But without a description of the collateral in a signed or authenticated document or in a separate document incorporated by reference into a signed or authenticated document, no security interest can be recognized. This Court is of the view that the Composite Document Rule is most appropriately used, if at all, to allow the debtor's intent to grant a security interest to be demonstrated by reference to the various loan documents where the debtor has signed or authenticated a document containing a description of the collateral that does

not contain words of grant. The Rule should not be applied, however, to bypass the necessity of a signed or authenticated writing that describes the collateral, as that is the clearly stated minimum requirement of § 9-203.

Even though the BANK may have intended that there was to be a security interest, the Court does not view the result reached as unduly harsh. The primary purpose of Article 9 of the UCC was to create uniformity and certainty in commercial transactions. The steps required to be taken by secured parties to establish and protect their interests, having been reduced to a minimum, are simple and clearly laid out. *In re Modafferi*, 45 B.R. 370 (S.D.N.Y. 1985). It is not unreasonable to require that they be complied with. *See, In re Swersky*, 1999 WL 135260 (N.D.Tex. 1999)(applying Illinois law).

The TRUSTEE objected to the BANK'S proof of claim filed as secured in the amount of $36,967.34 on the basis that the BANK had no valid security interest. Having now obtained that determination, the objection should be allowed, the BANK should be denied any secured claim, but should be allowed an unsecured claim in the amount stated in its claim.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###